**Melba J. TAYLOR, et al.,**
**Plaintiffs-Appellants,**

v.

**HUDSON PULP AND PAPER**
**CORPORATION, et al.,**
**Defendants-Appellees.**

**No. 84–3596.**

United States Court of Appeals,
Eleventh Circuit.

May 9, 1986.

Harry L. Witte, Jerry G. Traynham, Tallahassee, Fla., Richard T. Seymour, Mary Whisner, Washington, D.C., for plaintiffs-appellants.

Stuart Rothman, Perry M. Rosen, Roger A. Clark, Washington, D.C., for Hudson Pulp and Paper Corp.

Benjamin Wyle, New York City, for United Paperworkers.

Before HILL and CLARK, Circuit Judges, and MOYE *, Chief District Judge.

HILL, Circuit Judge:

### FACTS

This appeal arises from the district court's grant of appellees' Fed.R.Civ.P. Rule 41(b) motion to dismiss appellants' claim on the grounds that they failed to establish a *prima facie* case of sex discrimination under Title VII, 42 U.S.C. § 2000e *et seq.* The appellants, Melba Taylor Knowles, Jessie Mathews, Vivian Earls, Gertrude Burroughs, Delphine Carter, and Carrie Branham, are six female former and present employees of the Hudson Pulp and Paper Corporation's [hereinafter "Hudson"] Palatka, Florida converting plant who allege they have been denied promotions and transfers within the plant because of their sex. Appellees, Hudson and various employee unions, deny that any

* Honorable Charles A. Moye, Jr., Chief U.S. District Judge for the Northern District of Georgia, sitting by designation.

employment discrimination has taken place within the actionable period and instead contend that they have attempted to remedy the effects of any previous discrimination by actively encouraging females to enter jobs traditionally held by males.

Because of the nature of this case, some elaboration on the organization of the mill is necessary. The facility, which employs approximately 1500 people, is divided into various departments. Within these departments jobs are often organized in lines of progression, such that there is a designated sequence of related jobs arranged in ascending order of skills. When a vacancy occurs at a given level in a line of progression, the employee in the same line of progression with the highest job seniority in the level below the vacancy qualifies for the opening.

At the time of the suit giving rise to this appeal, only two departments in the plant, the grocery bag department and the tissue converting department, had a significant number of women employees. There also existed uneven distribution of men and women among the separate lines of progression within these two departments. Of particular importance in this case, the catcher quality line of progression within the grocery bag department had no men and 117 women while the machine line of progression in that department had 36 men and no women.[1] Although the entry level jobs in the catcher quality and machine lines paid approximately the same, there was much greater potential to advance to a higher paying job in the machine line.

All six appellants worked in the multi-wall department until 1970. In mid-1970, all the employees in the multi-wall department were laid off and given the option of applying for temporary and permanent assignments in other areas of the mill. Under the transfer procedure set forth under the collective bargaining agreement in effect at the time of the multi-wall department closing, as well as during the actionable period, an employee seeking transfer to another department submitted a written request to the personnel department. It was not required that a vacancy in the job desired exist at the time of the request. When a vacancy occurred, the employee who had submitted a transfer request, was minimally qualified, and had the greatest mill seniority was offered the position. Appellants contend that they and other women were told at the time of the multi-wall layoffs that their only options of transfer were the grocery bag department and the tissue converting department. In any event, each appellant requested and was granted a transfer to the position of bag catcher in the grocery bag department pursuant to the transfer procedure outlined above.

Effective June 1, 1974, a collective bargaining agreement was entered into which merged the two lines of progression in the grocery bag department and made all job titles gender neutral. This agreement was the one in effect during the charge-filing period. As a result of the merger, bag catchers could either (1) move up through the catcher quality line; or (2) transfer to the machine line above the position of chute loader. Thus, women employees could move up through the latter line of progression without having to work at the entry level position of chute loader. This action apparently was an effort to remove

---

1. Employees in the catcher quality line of progression advanced from bag catcher to either machine inspector relief or sample maker. Employees in the machine line of progression advanced from chute man to baler, to machine operator, and then to other jobs such as printer, molder, and oiler. The 1973 wage for Bag Catcher was $3.75 an hour for the first year and $3.755 thereafter. The rate for Sample Maker and Machine Inspector Relief was $3.955 an hour. The rate for Chuteman and Clean-up Man was the same as the rate for Bag Catcher, and the rate for Brokeman and for Baler during the first five weeks was the same as for Bag Catchers after one year. After five weeks, Balers received $3.93 an hour, and after four years they received $3.985 an hour. Balers could be promoted to Machine Operator ($4.20 to $4.33 an hour) or to Pasteman ($4.18 to $4.49 an hour). Machine Operators could be promoted to Oiler ($4.39 an hour), to Head Baler ($4.54 an hour), to the Printer-Molder line ($4.38 to $5.18 an hour), or to the Adjuster line ($4.38 to $5.69 an hour).

any barrier that the entry level position of chute loader, with its possibly prohibitive physical demands, created to women desiring to move into the machine line of progression.

In 1975 and early 1976, Hudson and the various employee unions negotiated two major changes in the 1974–77 collective bargaining agreement. The first, tentatively agreed to on January 23, 1976 and known as the "Amended Seniority Agreement," applied to all employees and served to abolish departmental seniority, leaving only job and mill seniority, rearrange lines of progression, and establish a transfer system whereby vacancies were posted and bid for at the time they occurred. The second agreement, known as "Special Seniority Procedures," was tentatively agreed to on March 25, 1976 and revised on April 22, 1976. It afforded significant preferential rights to black and female employees (labelled "designates") hired prior to the effective date of Title VII. Among these preferential rights were (1) the right to pre-bid for an entry level job when it was first posted within a department rather than waiting on the job to be posted mill-wide; (2) the right to transfer their mill seniority with them to their new positions, so that incumbent employees could not invoke their greater job seniority against these designates with respect to future transfers, advancements, recalls, etc.; and (3) the ability to retain their same rates of pay if they transferred to lower paying jobs until they were promoted within their new departments or lines of progression to higher paying jobs. Both agreements were signed on July 20, 1976 and became effective as of October 18, 1976. Hudson and the various unions began briefing designates as to their rights on or about September 7, 1976.

On September 30, 1976, appellants filed substantially similar charges with the EEOC asserting they were denied promotions within the grocery bag department and transfers to other departments because of their sex. As only claims arising within 180 days prior to filing of charges with the EEOC are actionable, *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the applicable charge-filing period within which appellants had to show acts of discrimination which injured them extended from April 3, 1976 to September 30, 1976. Specifically, each appellant alleged that she was allowed to transfer in 1970 only to a traditionally female job in the grocery bag department or tissue converting department and that because of the loss of her multi-wall seniority she was frequently laid off instead of male employees who had greater department seniority but less mill seniority. Five appellants also complained that there were specified jobs in the pulp mill which they could perform but that they could not take such jobs without losing their departmental seniority and risking unacceptable layoffs and that they were discouraged from moving up the line of progression to machine operator and above in the grocery bag department because they first had to work as a chute loader, a position which required the lifting of bales that were too heavy for most women to lift.

The EEOC processed appellants' charges and issued right to sue letters on May 13, 1977. Appellants then filed a class action complaint on behalf of all past, present, and future employees of Hudson on June 24, 1977. On May 2, 1979, after repeated changes of counsel, appellants filed their motion to certify the class, which was denied as untimely on December 16, 1983. The case was tried without a jury. At the conclusion of appellants' evidence, appellees moved to dismiss the action pursuant to Fed.R.Civ.P. 41(b), contending that appellants failed to establish a *prima facie* case of sex discrimination. The district court granted the motion. This appeal arises from that action by the district court.

### DISCUSSION

We examine initially appellants' contention that the district court erroneously ruled that appellants failed to establish a *prima facie* case of Title VII sex discrimi-

nation. In order to establish such discrimination, a plaintiff must demonstrate: (1) that she belongs to a protected minority; (2) that she applied for and was qualified for a job for which the employer was seeking applicants; (3) that she was rejected; and (4) that the employer continued to seek applications from persons with similar qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1141 (11th Cir.1983). The district court determined that the appellants failed to prove that they applied and were rejected for vacancies for which they were qualified, that such vacancies existed, and assuming such vacancies existed that they were given to less qualified persons of the opposite sex. As such, the district court held that the appellants failed to establish a *prima facie* case. A district court's finding of fact will be reversed only if it is clearly erroneous, leaving the reviewing court with the definite and firm conviction that a mistake has been committed. *Maddox v. Clayton,* 764 F.2d 1539, 1545 (11th Cir.1985). After a thorough examination of the record, we cannot conclude that the district court's finding is clearly erroneous.

We note initially that none of the appellants requested a transfer and was rejected during the 180 day charge-filing period established by the district court as extending from April 3, 1976 to September 30, 1976. Appellants assert that this is not fatal to their *prima facie* case as they refrained from applying for such transfers because of a justifiable belief that such requests would have been futile in light of Hudson's past discriminatory practices. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 368–71, 97 S.Ct. 1843, 1871–72, 52 L.Ed.2d 396 (1977); *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 334 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Considerable evidence

exists, however, that by the onset of the actionable period Hudson had abandoned any alleged discriminatory practices, was undertaking to remedy the effects of past practices, and that appellants were aware Hudson was in fact actively encouraging women to apply for positions which had previously been occupied exclusively by men.

The seniority agreements signed in July of 1976 afforded substantial preferential rights to blacks and women and involved extensive negotiations encompassing 1975 and early 1976. It is a reasonable inference that prolonged negotiations on such a sensitive issue would have created considerable controversy among the predominately male work force. In fact, the affidavit of appellant Knowles acknowledged that widespread hostility existed during the period the designate seniority was discussed and negotiated. Further, appellants were quite active in the union and attended numerous union meetings during the period the negotiations took place and at which these negotiations were discussed. Additionally, it is quite possible that appellants delayed requesting the transfer not because of any alleged past discriminatory practices on the part of Hudson, but rather so that they could take advantage of preferential seniority benefits afforded them pursuant to the seniority agreements of 1976. Sufficient evidence exists to create a credibility issue as to appellant's assertion that they were unaware of the seniority provisions until these provisions were discussed with the employees in September of 1976.

Other evidence further discounts the futility defense. In January of 1974, the company published in its monthly company newspaper an article entitled "Hey Lady, Wanna Be a Welder" which strongly encouraged women to transfer to jobs previously held by men.[2] Though appellants all

**2.** The article provided in part:
[W]hat about discrimination because of sex? If a woman wants to be a welder, or wants to work on the craft paper machines or wants to

try the tow-motor and load boxcars in one of the Shipping Departments, can she do it? Absolutely! All she has to do is put in a transfer.... After all, women proved they could

denied that they had read or even heard of the article, four appellants did admit to having either received regularly, read, or seen other issues of the newspaper, and Mary Hilton, a witness for appellants at trial and one of their fellow coworkers, testified on direct that she not only read the article but that it left a definite impression upon her. The June 1974 collective bargaining agreement rendered all job titles gender neutral as well as merged the lines of progression in the grocery bag department so that women employees could enter and advance in the machine line yet avoid what had previously been the physically prohibitive entry level position of chute loader. Between 1974 and shortly after commencement of the charge-filing period at least five women requested and received transfers to jobs traditionally held by men.[3] Evidence was introduced that one or more of the appellants knew each of the women. One of the women, Arta Mae Choate, had worked with appellants in the grocery bag department while another of the transferring women, Diane Suckow, was the step-daughter of appellant Knowles. Knowles' husband worked as an instrument mechanic in the mill, a position which enabled him to witness job changes throughout the plant and thus may have afforded him an opportunity to see one or more of these transfers. Moreover, it is reasonable to infer that had the cloud of discriminatory practices hung as heavily over the Hudson facility as appellants al-

lege, any transfer of a female into a traditionally male position would have invoked considerable notoriety.

Also, it is also not entirely clear that appellants would have been willing to give up their departmental seniority and risk possible layoffs for the new positions. The known prospect of discriminatory rejection shows only that employees who wanted particular jobs may have been deterred from applying for them. It does not show which of the applicants actually wanted such jobs. *International Brotherhood of Teamsters v. United States,* 431 U.S. at 369, 97 S.Ct. at 1871. Appellants have not identified jobs which they actually wanted or expressed an interest in during the charge-filing period. Rather, they ask the court to assume they would have requested and received the jobs for which they subsequently pre-bid when Hudson implemented the preferential special seniority procedures. A nonapplicant's willingness to transfer into a position does not confirm her past desire for the job. Until the 1976 agreements an employee transferring to a different line would have been forced to forfeit her departmental seniority, so that she would be placed at the bottom of the seniority ladder with respect to the new line. This policy applied equally to men and women. Appellants asserted in their EEOC charges that they could not transfer to other jobs because such transfers would entail a loss of departmental seniority and the risk of unacceptable layoffs. Evidence

weld during World War II right here close at home at the shipyards in Jacksonville. Similarly, if a woman is capable and willing to start out on the broke meters she then has the opportunity to work toward a machine tender. If she is willing to work in the lime kilns she can then be on the road to becoming a digester cook. This is the same route that the men take.

So what about it ladies? You know a gal doesn't have to be a bra-burning women's libber in order to want to do something beside catch bags or napkins or pound a typewriter for eight hours. She just might be able to load that box car as good as any man; after all the tow-motor does most of the work. And if this is what she wants and if she can do the job, why shouldn't she be given the opportunity?

3. In May, 1974, Phyllis Smith transferred from tissue converting to the laboratory as a craft pulp tester, receiving temporary seniority. She became permanent in May of 1975. In October, 1974, Arta Mae Choate transferred from the grocery bag department, in which appellants were then working, to the position of store issues clerk on a temporary seniority basis. She became permanent prior to July 20, 1976. On August 25, 1975, Virginia Shepherd transferred to store issues clerk on a temporary basis and became permanent in 1979. On April 12, 1976, Diane Suckow, appellant Knowles' step-daughter, transferred to the wood receiving department as a wood checker. On April 19, 1976, Mary May transferred to the laboratory as a craft pulp tester.

thus exists that appellants delayed any contemplated requests for transfers not because of the prospect of discriminatory rejections, but rather because of the unattractive policy of loss of departmental seniority upon transfers to another line.

Regarding alleged denial of promotions within the grocery bag department, appellants introduced evidence that their failures to apply for such promotions when positions became available are irrelevant as the promotional procedures established by the collective bargaining agreement and company practice provided that upon the occurrence of such a vacancy the employee with the highest job seniority in that line of progression was offered the position and in fact was required to sign a waiver if she did not want the promotion. Thus, rather than the employee approaching the employer, as was the case with the transfer procedure, in the promotional context the employer approached the employee. Even were we to find this the case, appellants still failed to establish a *prima facie* case of sex discrimination as substantial evidence exists that within the department no vacancy occurred for which any appellants were the most qualified. Although appellants allege that seventeen males junior to them in seniority were promoted to baler positions in the grocery bag department during the charge-filing period, it appears each of these males in fact had occupied a baler job on a temporary basis since 1975. As those with temporary status were pursuant to the collective bargaining agreement entitled to the first permanent opening, no promotion vacancies in fact occurred for which appellants were most qualified. We recognize that appellants point to evidence indicating that two of the seventeen males had temporary status in positions other than baler. They in turn contend that this supported their allegation that promotional vacancies occurred which were filled by males less qualified than appellants. Taking the evidence regarding this issue on the whole, the district court's finding on this issue was not clearly erroneous.

We are not unaware of evidence presented at trial indicating that Hudson continued its discriminatory practices through the actionable period or that even were such practices discontinued, appellants retained a justified belief that such practices remained in effect. Howell Gordon, a shift supervisor in the grocery bag department from 1962 until late December 1976, testified that irrespective of the 1974 collective bargaining agreement merging the lines of progression in the grocery bag department the practice of assigning only women to the catcher quality line and only men to the machine line continued. Further, jobs continued to be posted under the heading "women's work schedule" and "men's work schedule." Appellants introduced at trial a statistical analysis of the company's work force as of 1980 indicating that 13 production and maintenance departments still had exclusively male permanent employees. Of the 1,073 permanent hourly employees in all departments, over 80 percent were men. An expert witness testified that the probability of the observed distribution of men and women by department occurring at random was only one chance in 10,000.

■ However, upon a thorough examination of the record and review of the testimony, we cannot conclude that the district court's findings were clearly erroneous. Much of the evidence upon which appellants relied pertained to conduct occurring prior to the actionable period or was merely the effects of discrimination practiced before the actionable period and which Hudson was actively attempting to correct. Regarding the statistical evidence introduced at trial and the expert testimony regarding that evidence, it is important to note that this statistical evidence represents merely a snapshot of the work force as it existed in 1980, and ignores the effect that the decrease in the total work force due to economic conditions had upon Hudson's ability to intergrate women into positions previously traditionally male. In other words, as the total work force was decreasing, vacancies which could be filled by women seldom became available. Considerable evidence has been presented both

that Hudson had abandoned any alleged discriminatory practices long before the onset of the actionable period and that appellants were not deterred from seeking transfers or promotions by the threat of discriminatory rejection. As to any conflicting evidence and testimony, where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Anderson v. Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

■ While it may be and is clear that a nonapplicant may establish a *prima facie* case by showing that due to the employer's discriminatory practices the application would have been a futile gesture, the evidence presented in this case fully authorized the district judge to find that no such futility existed here. Indeed, the evidence is overwhelming that an application for transfer would not have been futile; such applications for transfer were actively solicited by the appellees and, when received, were granted.

■ Title VII states an important public policy of this nation. Where practices of employer units have not been in accordance with that policy, it is in the public interest that the former practice be speedily corrected. Discrimination in employment denies the members of a class their employment and promotional opportunities, providing only the opportunity to the class members and their counsel to sue. Compliance with the law expressed in Title VII and the national policy there represented affords all employees proper employment and advancement opportunities while eliminating such opportunities as may be represented by the rights of class members and their attorneys to sue. The federal courts do not have such affection for litigation that we ought to chill *bona fide* and constructive measures on the part of employers to abide the national policy lest their employees be thereby denied the opportunity to litigate and the courts be denied the opportunity to adjudicate. If the appellants in this action perceive litigation as a great benefit, the evidence supports the

district judge's finding that, by the time they proceeded, the appellees had substituted the benefits of fair nondiscriminatory practices for what once may have been the benefit of a lawsuit. For these reasons we affirm the ruling of the district court that appellants failed to establish a *prima facie* case of sex discrimination.

Appellants raise a number of other contentions of error in their appeal. However, due to the disposition of the previous issue, it is unnecessary for us to examine these other alleged errors. Therefore, the decision of the district court is

AFFIRMED.

Appellants have also submitted a motion requesting that they be allowed to supplement the record on appeal. As this new material concerns an issue which we need not address in light of our disposition of the case, the motion is

DENIED.

CLARK, Circuit Judge, dissenting:

The record in this case clearly reveals that appellants met their prima facie burden of demonstrating sex discrimination in Hudson's promotion practices. This claim should be remanded to the district court for presentation of Hudson's case. With respect to appellants' discrimination in placement (transfer) claim, the district court failed to consider (or reveal how it considered) significant, relevant evidence. It also made critical errors of law. Rather than conducting our own fact-finding to determine whether the district court's judgment should be affirmed, we should remand this claim to the district court for proper consideration of appellants' futility argument.

I. *Promotions*

To understand appellants' promotion claim, it is necessary to know something about the way promotions at Hudson were to work under the relevant collective bargaining agreement. When a vacancy occurred in a permanent position, the person with the most temporary seniority in the

vacant position was to be offered the promotion. If no one held a temporary slot in the position or if the temporary employees declined promotion, the person with the most job seniority in the position previous in the line of progression to the vacant position would be promoted into the available job unless that person signed a waiver form declining the promotion. There was no need to apply for promotion or indicate any interest in it. The person next in line (in terms of job seniority) was automatically to be asked.

The bag catcher position, historically assigned to women, and the chute loader position, historically assigned to men, both fed into the baler position as of the merger of the lines of progression in the Grocery Bag Department in 1974. When a baler vacancy occurred, the most senior bag catcher or chute loader should have been promoted to baler, unless someone was already working as a temporary baler and was therefore entitled to preference.

In September, 1976, seventeen men were promoted to permanent baler positions. Fifteen of these were temporary balers and so properly given priority in promotion.[1] However, two of the promotions were given to men whose job seniority entitled them to no preference over appellants. One had temporary seniority as a "broke handler" dating back to January 30, 1976. He had moved into broke handling from chute loading and had mill seniority only as of July, 1975. The other had temporary seniority as a "bypass rich and joyce for broke" and had mill seniority as of July, 1975. He had also been a permanent chute loader when placed in his temporary position. Appellants all had job seniority as bag catchers dating back to September, 1970. None was offered a baler position at the relevant time. As these men had neither temporary seniority as baler entitling them to preference in promotion nor sufficient job seniority as chute loaders to entitle them to promotion over appellants, appellants have clearly made out a prima facie case of discrimination in promotion falling within the limitations period.

The majority acknowledges the evidence presented by appellants to demonstrate that the two baler promotions were discriminatorily made, but fails to accord it any significance, saying only: "Taking the evidence regarding this issue on the whole, the district court's finding on this issue was not clearly erroneous." Majority Op. at 1461. I cannot understand the majority's approach to this issue. The district court did not discuss appellants' promotion claim, let alone make any findings with respect thereto. How, then, can the majority determine that the district court's finding on this issue is not clearly erroneous?

The district court discussed only the transfer claim. In that context, the district court found that no plaintiff had requested an intradepartmental transfer and that no vacancy had occurred during the limitations period. Record Excerpts at 63–64. To the extent that these may be considered findings bearing on the promotion claim, the majority's discussion reveals them to be clearly erroneous. Majority Op. at 1461. There is no dispute that there was no such thing as an "intradepartmental transfer" under the 1974–1977 collective bargaining agreement and that an employee was not required to request a promotion. Furthermore, there were at least seventeen vacancies in the permanent baler position during the limitations period. There is simply no basis for affirming the district court's dismissal of the promotion claim. "Taking the evidence regarding this issue on the whole," fifteen nondiscriminatory promotions do not cure or in any way legitimate two discriminatory promotions.

---

1. However, the original placement of the fifteen men in temporary baler positions was clearly discriminatory. These men, who had not only job but mill seniority that dated back only to 1975 or 1976, were made temporary balers before women who had job seniority dating back as far as the 1950's. No woman was offered a promotion. Because the original discrimination occurred before the limitations period, it cannot form the basis of appellants' prima facie case unless other instances of discrimination in promotion occurred within the period. *See infra* at 1464–65.

It is true that appellants have demonstrated only two instances of discrimination within the limitations period while appellants number six. Appellants have alleged that the failure to promote women in the Grocery Bag Department is continuing discrimination. They need only demonstrate one instance of present discrimination within the period to be entitled to recover for other instances of the continuing discrimination that occurred before the onset of the limitations period. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Supreme Court held, in the Fair Housing Act context, that "[w]here a plaintiff ... challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Id.* at 382–83, 102 S.Ct. at 1125. In *Havens Realty*, plaintiffs had alleged five separate instances of housing discrimination, only one of which fell within the 180-day limitations period. The other discriminatory acts had been suffered by a different plaintiff prior to the 180-day period, yet the Supreme Court held that all the claims were timely because they were all instances of one continuing violation.

The Court pointed out that staleness concerns disappear when a discriminatory practice is shown to have continued into the limitations period. It further reasoned that "wooden application" of the statute of limitations "ignores the continuing nature of the alleged violation" and "undermines the broad remedial intent of Congress." *Id.* Although the Court was not interpreting Title VII's statute of limitations, the reasoning of the Court applies equally in the Title VII context. Indeed, the Supreme Court cited a Title VII case in explaining that application of a statute of limitations should reflect the broad remedial purpose of the law. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Moreover, when plaintiffs show that discrimination continued into the limitations period, the court is assured that they challenge present discrimi-

nation rather than the present effect of past discrimination. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

In this circuit, a plaintiff who has never filed an administrative charge may proceed in an action with a plaintiff who has properly filed charges if the issues they raise are similar. *See, e.g., Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir.1985) (class action); *Crawford v. United States Steel Corp.*, 660 F.2d 663, 665–66 (5th Cir. Unit B 1981) (multiple plaintiff non-class action). It is not clear from the facts or discussions in these cases whether nonfiling plaintiffs are limited to litigating claims that arose during the limitations period relevant to the charges that were filed. However, the courts reasoned that the purpose of requiring that charges be filed with the EEOC— to give the EEOC notice of and an opportunity to investigate discriminatory practices—is served when one charge is filed. Where, as here, the discriminatory actions that occurred prior to the limitations period were but instances of a practice shown to continue into the period, the same reasoning supports allowing all the plaintiffs to proceed on the charges that were timely filed. The EEOC was notified of and given a chance to investigate the discriminatory practice—failure to promote. "There is no question but that, if the employer has a formal rule or policy which discriminates in ... allocation of jobs ..., and the system is maintained into the period, the system or practice can be attacked despite the fact that the plaintiff was not denied a particular job ... within said charge-filing period." B. Schlei & P. Grossman, *Employment Discrimination Law* 1050 (2d ed. 1983) (citing cases); *see also* C. Sullivan, M. Zimmer & R. Richards, *Federal Statutory Law of Employment Discrimination* 279–80 (1980).

There can be no dispute that the claims of appellants arose from the same discriminatory practice. All worked in the same department at the same position. All were denied the opportunity to be promoted to baler because, despite the formal merger of

the bag catcher position into the baler line of progression in 1974, bag catchers (all women) were never offered the promotions due them under the collective bargaining agreement. Because two of the EEOC charges were timely filed, the district court had jurisdiction over the promotion claims of all six appellants. As pointed out earlier, appellants have demonstrated that all fifteen of the men promoted from temporary to permanent baler in September of 1976 were promoted to temporary baler in 1975 and early 1976 over appellants, who had more job seniority than any of the fifteen men receiving the transfers. There can be no doubt that each of these women has made out a prima facie case of sex discrimination in promotions, and each is entitled to return to the district court for the completion of the trial.

## II. *Transfers*

The district court found that appellants failed to establish a prima facie case because they did not prove that they had requested transfers or that vacancies had occurred during the limitations period. Record Excerpts at 64. The finding regarding vacancies (not discussed in the majority opinion) is clearly erroneous in light of evidence that thirty-six entry-level openings outside the Grocery Bag Department were filled by men during the limitations period. *See* Appellants' Brief at 18a–23a (Table B); Plaintiffs' Exhibit 8. The majority affirms the district court's finding with respect to the failure to apply and rejects appellants' claim that they did not apply for transfers because of a justifiable belief that such application would have been futile. In reaching its decision, the majority conducts substantial fact-finding that it should not, as an appellate court, conduct. I cannot agree with its decision to do so or with its factual conclusions.

Appellants' futility argument is based on *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct.

1843, 52 L.Ed.2d 396 (1977). In that case, the Supreme Court recognized that:

> [t]he effects of and injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.

*Id.* at 365, 97 S.Ct. at 1870. The Court held that nonapplicants could make out a prima facie case of race discrimination under Title VII. In applying *Teamsters*, a court looks to the existence of a belief in futility (the state of mind of the plaintiff) and the reasonableness of the belief (an objective inquiry). *See Garrett v. Okaloosa County*, 734 F.2d 621, 625 (11th Cir.1984); *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 761–62 (9th Cir.1980).

The district court made no finding as to the state of mind of appellants.[2] The district court instead framed the inquiry in objective terms: would it have been futile to apply? Record Excerpts at 64. The appropriate question is: Did appellants justifiably believe that application for transfer would have been futile because of Hudson's discriminatory practices? Framing the question correctly is crucial to identifying the evidence relevant to the fact-finding determination. Focusing on justifiable belief broadens the inquiry to include evidence of the plaintiff's career-long experiences with the employer's discrimination in all areas, as well as of the employer's actual practice during the limitations period, because such experiences would affect a female employee's expectations with regard to her transfer opportunities.

Any finding implicit in the district court's discussion that a belief in futility was not justified (or, for that matter, that application would not have been futile) is clearly erroneous. The court first found that only the testimony of Howell Gordon supported

---

**2.** In fact, all testified that they did not think that they were allowed to work anywhere in the plant but in the jobs historically assigned to women.

appellants' futility argument. Gordon, a supervisor in the Grocery Bag Department from 1962 until January, 1977, testified that even after the formal merger of the men's and women's lines of progression in 1974, he continued to assign women only to historically women's jobs (bag catcher or inspector) and men only to historically men's jobs (baler or machine operator). This practice continued through the limitations period.

This testimony, alone sufficient to demonstrate that appellants' belief in futility was justified and that the district court was clearly erroneous in finding that it would not have been futile to apply for men's jobs, was corroborated and supplemented with further evidence that Hudson continued to discriminate up to and through the limitations period. Male and female employees testified that they were unaware that the segregated lines of progression had been merged in 1974. As I have already mentioned, documentary evidence corroborates Gordon's testimony, and the employees' perception, by demonstrating that men were promoted into the baler position ahead of women with far more years job seniority. Appellants introduced Weekly Work Schedules denominating certain jobs as "men's" and others as "women's." These separate listings of men's and women's jobs continued through the relevant period and into 1980. Hudson also maintained separate "Extra Boards"—on which laid-off employees were to indicate an interest in temporary jobs in departments other than those in which they permanently worked—for men and women.

The 1974–1977 collective bargaining agreement (as well as all such agreements through 1983) provided that female employees would be entitled to two break periods per shift not given to men, with the following exception:

> Female employees who, on or after December 1, 1965, move on to jobs not previously available to females, will not have available to them the two fifteen (15) minute rest periods referred to above.

Plaintiff's Exhibit 7–G at 60. Only men were allowed to work overtime, at overtime rates, to clean up in the Grocery Bag Department. Appellants' "snapshot" statistics demonstrate that fifteen years after enactment of Title VII, and four years after the actionable period in this case, Hudson's work force remained almost completely segregated by sex.[3]

All this evidence relates to discriminatory practices contemporaneous to the actionable period that would influence a female employee's perception of her mobility within the Hudson plant. Because the appellants' perceptions were shaped by previous

---

**3.** Although appellants do not rely on their statistical evidence to establish prima facie proof of discrimination, the majority's possibly misleading discussion of the proper use of "snapshot" statistics in proving discrimination should be noted. The Supreme Court in *Teamsters, supra,* held that such statistics may be sufficient to establish a prima facie case of discrimination. 431 U.S. at 339, 97 S.Ct. at 1856; *see also Griffin v. Carlin,* 755 F.2d 1516, 1525 (11th Cir.1985). Thus, it is the defendant's burden to refute "snapshot" statistics by offering more refined and accurate statistics such as "flow" statistics showing employment patterns as they occurred over time. *See Movement for Opportunity and Equality v. General Motors Corp.,* 622 F.2d 1235, 1245 (7th Cir.1980). The defendant may not successfully rebut stark statistical evidence of segregation by pointing to a declining work force, as the majority contends, for it is the employee turnover rate, not the overall number of employees, that determines the number of vacancies. *Teamsters,* 431 U.S. at 341, 97 S.Ct. at 1857. So long as the number of new hires were less than the number of departures, the employer could hire in significant numbers while experiencing an overall decline in work force.

If snapshot statistics may form the basis of a prima facie case of discrimination, there appears to be no reason to consider such statistical evidence irrelevant to the justifiability of a belief in futility due to the employer's discrimination. If a court may infer that a rigidly segregated work force reflects discriminatory practices, it must grant that similar inferences drawn by employees are justified. As the statistics presented in this case are as stark as those before the Court in *Teamsters,* I would give them considerable weight in assessing whether appellants' belief—that applying for transfer into historically male jobs would be futile in light of the employer's discriminatory practices—was justified.

experiences with their employer,[4] the aforementioned evidence must be viewed against the backdrop of Hudson's long history of sex segregation and discrimination.

The collective bargaining agreements through 1966 set forth separate starting rates and base rates for men and women, with women's rates lower than men's. Women's jobs within each department were designated as such in the collective bargaining agreement. This blatant sex segregation continued until January, 1966, six months after the effective date of Title VII.[5] Thereafter, most sex-specific job titles were removed from the contract, but some remained: "Matron," "Broke Man," "Chute Man," "Pasteman." There is no evidence that Hudson made any further effort to eliminate sex segregation before 1974.

Practices in the Multiwall Department, where appellants worked until 1970, reflected the sex segregation formally established in the collective bargaining agreements. Women worked at certain jobs that, until January, 1966, had sex-specific titles. Men worked at other jobs. When the Multiwall Department was relocated to a distant city and appellants were forced to transfer to new jobs, they were told that they could transfer only to the Grocery Bag Department or the Tissue Converting Department, the two departments that had women-only lines of progression. The male Multiwall employees transferred to jobs in many other departments.

After their transfers, Hudson continued to communicate to appellants that women were allowed to fill only certain positions.

As Howell Gordon testified, job assignments in the Grocery Bag Department continued to be made according to sex through January, 1977. Indeed, the district court found that "sex was involved to some extent in where individuals were placed, from the period of 1970 to at least 1974." Record Excerpts at 62.

Ignoring most of the evidence that Hudson continued to discriminate through the limitations period, the district court relied on three pieces of evidence to find that it would not have been futile to apply to transfer to a male department or job: (1) the merger of the bag catcher (female) and machine operator (male) lines of progression in the 1974 collective bargaining agreement; (2) the successful transfer of a few women into historically men's jobs (three had transferred prior to the commencement of the limitations period; another two transferred during the limitations period); (3) the 1974 publication of an article in the Hudson newsletter indicating that women could transfer into historically men's jobs. Rejecting Mr. Gordon's testimony—direct evidence that sex discrimination continued through the limitations period[6]—the district court found that application would not have been futile and that appellants had failed to establish a prima facie case of sex discrimination. It did not find that appellants did not believe application would have been futile. Nor did it find that any such belief would not have been justified.

The majority, also ignoring most of the evidence that Hudson continued to discriminate,[7] finds that the evidence upon which

---

**4.** Melba Taylor (now Knowles), Jessie Mathews, Vivian Earls, Gertrude Burroughs, Delphine Carter and Carrie Branham were hired in 1953, 1953, 1949, 1950, 1954 and 1953, respectively.

**5.** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e was enacted on July 2, 1964 and went into effect on July 2, 1965.

**6.** Because plaintiffs presented direct evidence of discrimination, it would have been Hudson's burden to prove that it would have made the same decisions even in the absence of the discriminatory motivation. *Cox v. American Cast*

*Iron Pipe Co.,* 784 F.2d 1546, 1559 (11th Cir. 1986); *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982).

**7.** Although the majority acknowledges evidence that tends to justify belief in futility and, more generally, to bolster appellants' prima facie case, it concludes that the district court's (unspecified) findings were not clearly erroneous. Majority Op. at 1461. If the findings to which the majority refers are the findings with respect to justified belief in futility, its discussion of the evidence misses the point. It does not matter that discriminatory practices took place before

the district court relied supports the conclusion that "[c]onsiderable evidence exists ... that by the onset of the actionable period Hudson had *abandoned* any alleged discriminatory practices, was undertaking to remedy the effects of past practices, and that appellants were aware that Hudson was in fact *actively encouraging* women to apply for positions which had previously been occupied exclusively by men." Majority Op. at 1459 (emphasis added).[8] To do so, it must find that appellants were aware of the steps taken by Hudson, a leap the district court did not make, and infer that appellants could not justifiably have retained a belief in futility in the face of this awareness.

Its effort is unconvincing. None of the appellants had seen the "Hey Lady, Wanna Be a Welder" article. Furthermore, although each appellant testified that she "knew" one or the other of the women who had successfully transferred into "male" positions, each also testified that she did not know about the transfers. It appears from the testimony that appellants' acquaintance with the transferees was minimal and is more accurately reflected in stating that appellants knew who the transferees were than in stating that appellants knew them. Even if it can reasonably be inferred that appellants were aware that a very few women had successfully transferred, *Teamsters* demonstrates that evidence of visible tokenism should not defeat a futility claim. In that case, the Supreme Court in no way indicated that the fact that five Spanish-surnamed individuals had been hired as line drivers prior to filing of the law suit would preclude all Spanish-surnamed nonapplicant class members from

participating in the superseniority remedy. *See Teamsters*, 431 U.S. at 337, 362–71, 97 S.Ct. at 1855, 1868–73; *see also Bing v. Roadway Express, Inc.*, 485 F.2d 441, 451 (5th Cir.1973) ("Certainly a few ... have the courage to fight 'the system,' but it is equally certain that others must have been intimidated and discouraged by [the employer's] practices."). Finally, paper merger of historically sex-segregated lines of progression does not render unjustified a belief in the futility of application for transfer when testimony by the person responsible for putting paper into practice reveals that the merger was not effectuated during the relevant period. One does not have to credit the testimony of male and female (plaintiff and non-plaintiff) witnesses that they were unaware of the formal merger to find that the paper merger in no way supports rejection of the futility argument.

In addition to the evidence recited by the district court, the majority leans heavily on its own inferences drawn from the fact that a superseniority agreement for the benefit of women such as appellants was negotiated and signed by Hudson and the unions during the limitations period. The fact that a superseniority plan was in the works during the limitations period may be relevant to the futility assessment in two ways. First, it may be considered to have demonstrated to appellants that Hudson was willing to allow them to break into formerly all-male positions. Second, it may be offered to support the contention that appellants refrained from applying to take advantage of the upcoming transfer benefits rather than because of Hudson's entrenched discrimination. The second point

the actionable period so long as the nonapplicant's belief in futility arising from those practices justifiably continued into the limitations period. As many of the instances of discrimination not falling within the limitations period occurred immediately prior to the relevant period (not to mention the practices that continued throughout the period), these instances, at least, should be weighed in support of appellants' position.

**8.** Considering the evidence recounted above that Hudson continued to discriminate past the ac-

tionable period, the majority's statement is bald hyperbole. However laudable Hudson's initial efforts to end its discriminatory practices and desegregate its work force, the fact remains that its attitude toward discrimination, as revealed in its practices, remained equivocal at best. Far from "[c]onsiderable evidence" that Hudson "abandoned" discrimination, there is considerable evidence that Hudson wanted to have its discrimination and avoid lawsuits, too. Any interpretation of the record that sees active encouragement of desegregation is likewise wishful thinking.

goes to whether any justifiable belief actually caused the failure to apply, which will be discussed below.

The first point reflects on whether the appellants' asserted belief that they could not transfer into male-only jobs was justified. If appellants knew about the negotiations, perhaps they should have realized that Hudson was willing to allow previously forbidden transfers. The majority suggests that appellants were aware that the designate plan was being discussed during the limitations period. However, appellants testified that they were unaware that the designate seniority plan had been adopted until Hudson held meetings in the fall of 1976 to inform the employees of the terms of the agreement. It is true that an affidavit given by Melba Knowles in 1982, which states that there was widespread hostility toward the designate seniority plan during the time the plan was being discussed and negotiated, conflicts with her testimony. The affidavit is the only evidence that any of the appellants knew or should have known of the plan before September, 1976. It does not prove that Knowles was aware of the plan throughout the limitations period, the conclusion that must be reached to defeat her futility argument. Nor does it reveal the level of detail of any knowledge that may be inferred to have existed. There is no evidence that appellants "attended numerous union meetings during the period the negotiations took place and at which these negotiations were discussed." Majority Op. at 1459–1460. Appellants' testimony disclosed only that some of them were active in the union at some unspecified point in their twenty-plus year careers with Hudson and that some of them attended an unspecified number of meetings at unspecified times during 1975 and 1976. There was no evidence presented that the designate plan was discussed at any meeting, let alone at any meeting attended by an appellant. Thus, the determination whether appellants knew anything about the designate plan that should have communicated to them Hudson's willingness to allow women into men's jobs is purely a matter of credibility

assessment. The district court made no finding one way or the other, and the majority is in no position to resolve a credibility dispute.

Assuming, however, that appellants were fully aware that Hudson and the unions were negotiating a plan that would allow women and blacks to transfer into previously segregated jobs, the question remains whether this knowledge would render incredible or unjustified any belief in the futility of applying for a transfer prior to the effective date of the plan. On the facts of this case, given appellants long experience with Hudson's discriminatory practices, I can only conclude that the credibility of appellants' belief that they *could not* transfer is not weakened by such knowledge. Rather than understanding Hudson's participation in negotiations to mean that they were free to transfer into men's jobs, women such as appellants may have understood negotiations to represent a battle over the means by which they would be admitted to forbidden territory; implementation of the plan, and not Hudson's willingness to negotiate (if any can be presumed), would signal the end of discrimination. Thus, it would be reasonable for appellants to have believed that they would be allowed to transfer to "men's" jobs only through, and because of, the designate program. Their knowledge that the plan might take effect ought not be equated with belief they could transfer prior to the effective date.

Hudson's history of sex discrimination and appellants' extensive and intimate familiarity with it, as well as the evidence of discrimination occurring within the limitations period, establishes that appellants' belief that they would not be allowed to transfer out of women-only jobs was credible and justified. However, I realize that to reach this conclusion I have had to indulge in the same kind of fact-finding for which I have taken the majority to task. As the district court did not make findings one way or the other on the issue of the existence and justifiability of appellants' belief in futility, and erred in finding appli-

cation would not be futile, I would remand to the district court to make findings consistent with the correct legal standard. I cannot join in the majority's factual determinations [9] or the legal conclusions resulting therefrom.

I am also troubled by the majority's treatment of the question whether appellants have demonstrated that they did not apply *because of* their belief in the futility of application. The majority states that appellants did not identify jobs they actually wanted or in which they expressed an interest during the limitations period but relied on their designate program bids to prove their interest. Majority Op. at 1460. However, appellants do not claim that their willingness to transfer under the designate program proves that they would have transferred prior to implementation of the program if they had not believed that application would be futile. Rather, each testified that she would have transferred if she had realized she would be allowed to do so. This evidence is sufficient to show that appellants' failure to apply was caused by Hudson's discrimination. Appellants need not demonstrate that they actually expressed desire for particular jobs, for the plaintiff's task is to prove that "he would have applied for the job had it not been for those practices." *Teamsters*, 431 U.S. at 368, 97 S.Ct. at 1871; *see also Cox, supra,* at 1560. Although the Court in *Teamsters*

indicated in a footnote that such proof might take the form of evidence of an informal inquiry, expression of interest or unexpressed desire, *id.* 431 U.S. at 371 n. 58, 97 S.Ct. at 1873 n. 58, its discussion makes clear that these are all just means of identifying the "choice an employee would have made had he previously been given the opportunity freely to choose...." *Id.* at 371, 97 S.Ct. at 1873. An employee who can show that she would have transferred into a "man's" job if not for discriminatory practices that led her to believe such a step would be out of the question has demonstrated that she would have chosen to transfer.[10]

Appellants had all worked for Hudson for over twenty years as of the beginning of the limitations period. For over twenty years, Hudson had communicated to appellants that certain jobs were for women, and women only, while others—the better-paying jobs—were for men and men only. Because these women had worked only for Hudson for all or the great majority of their working years, their belief that they could not work in men's jobs may be attributed to their experience with Hudson's discriminatory practices. Their testimony that they would have transferred into "men's" jobs if they had known they could should be credited as proof that Hudson's discrimination caused their failure to apply for transfers.

9. Once again I must point out that the majority's sweeping conclusions with respect to factual issues are unsupported by the record. In particular, I refer to the reiteration that "considerable evidence has been presented ... that Hudson had abandoned any alleged discriminatory practices long before the onset of the actionable period ...," Majority Op. at 1461, as well as the statement that "the evidence is overwhelming that an application for transfer would not have been futile; such applications for transfer were actively solicited by the appellees and, when received, were granted." Majority Op. at 1462. The factual questions are far more difficult than the majority would have them. Furthermore, there is no evidence that all applications for transfer were granted.

10. The majority's emphasis on proof of interest or desire places beyond the scope of Title VII the most entrenched forms of sex discrimina-

tion. Sex discrimination has been marked by its segregation of women into work roles different (not merely separate) from those performed by men. The woman who has been most thoroughly victimized by sex discrimination will believe she is limited to those jobs traditionally assigned to women. She will not realize she wants a "man's" job. Yet, when a woman's desire for a job is not translated into a formal application because the sex discrimination with which she lives has become internalized to the point she believes herself to have no choices, she is as much a victim of discrimination as is she who can envision herself working at a "man's" job and turns that vision into desire. To hold that the first woman is not protected by Title VII "put[s] beyond the reach of equity the most invidious effects of employment discrimination—those that extend to the very hope of self-realization." *Teamsters,* 431 U.S. at 367, 97 S.Ct. at 1871.

Even under the majority's interpretation of appellants' burden, several of the appellants should be found to have succeeded in carrying it. Vivian Earls applied and was rejected for a printer position sometime in 1975 or 1976 (before commencement of the limitations period).[11] Carrie Branham testified that she had been interested in the jobs of baler and machine operator. Jessie Mathews testified that she would have moved into the tissue pulp tester job if given the opportunity. Melba (Taylor) Knowles asked the labor relations manager, Bob Garrett, if she could transfer to the lab when Multiwall was phased out in 1970. She also asked Carl Kight, a union official, about becoming a baler in early 1976.

The majority fails to acknowledge this evidence and rejects appellants' testimony that they would have applied to transfer to the better-paying "men's" jobs if they had realized women were allowed to do so, finding instead that "evidence ... exists that appellants delayed any contemplated requests for transfers not because of the prospect of discriminatory rejections, but rather because of the unattractive policy of loss of departmental seniority upon transfers to another line." Majority Op. at 1461.

The evidence cited by the majority, appellants' EEOC charges, does not, however, contain assertions that "they could not transfer to other jobs because such transfers would entail a loss of departmental seniority and the risk of unacceptable layoffs." *Id.* The charges state that they were not permitted to transfer because they were women. They also state that if they were allowed to transfer they would be subject to layoff despite their twenty-plus years of mill seniority. They did not say or imply that they would not transfer *because* of the loss of seniority. Obviously, that they felt it was unfair and discriminatory that they should always remain at a disadvantage to more junior male employees does not tell us whether they would have been willing to risk departmental se-

niority to transfer to better-paying jobs. There is no other evidence that they were deterred by neutral disincentives in the collective bargaining agreement. If we are going to infer anything from the bare fact that the collective bargaining agreement contained disincentives to transfer, we may as well infer that appellants were deterred by the loss of two fifteen-minute breaks per shift, a gender-specific disincentive. *See supra,* p. 1461. We would not be required to reject appellants' futility argument were we to do so. I see no reason to choose one inference over the other.

Moreover, there is no evidence that appellants delayed their applications to take advantage of the designate program or had any reason to do so. *See* Majority Op. at 1460. Nothing in the record or, more particularly, in the Special Seniority Procedures indicates that a woman who transferred or applied to transfer prior to the effective date of the designate program would be barred from participating, or in any way disadvantaged if allowed to participate, in the designate program. There is no basis for the majority's inference that anticipation of the designate program, rather than appellants' belief in futility, deterred them from applying for transfer into "men's" jobs during the limitations period. There being no evidence that appellants were deterred from applying by other gender-neutral considerations, I would accept their testimony that they would have applied for "men's" jobs had they not been led to believe they would not be allowed to take such jobs.

### III. *Conclusion*

Ultimately, the question to be answered in this case is whether appellants were victims of intentionally discriminatory practices of which the EEOC was timely apprised. My review of the record leaves me with the definite and firm impression that the district court erred in failing to find that appellants' evidence raised a rebut-

---

**11.** Evidence of interest expressed prior to the actionable period is relevant. *Teamsters,* 431 U.S. at 371 n. 58, 97 S.Ct. at 1873 n. 58 (overt act such as *pre-Act* application would be most convincing proof that futility caused failure to apply).

table presumption that they had indeed suffered such discrimination. That Hudson took steps to end some of its discriminatory practices does not lessen or eliminate its liability for the discrimination experienced by appellants. An employer may not "substitute" present efforts to remedy discrimination for liability for past discrimination. Majority Op. at 1462. Neither does the law support the district court's finding that "any discriminatory practices prior to 1974 was [sic] cured by the [1974–1977] collective bargaining agreement, which on its face is facially neutral." Record Excerpts at 63. We may not dismiss a sex discrimination case against an employer because we fear it will "chill *bona fide* and constructive measures to abide [sic] the national policy [embodied in Title VII]." Majority Op. at 1462. As the Supreme Court recognized in *Teamsters:*

> The company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previously illegal conduct or its obligation to afford relief to those who suffered because of it.

341 U.S. at 341–42, 97 S.Ct. at 1858. Regard for an employer's attempt to change its ways should not influence our assessment of its liability for actions that are not as worthy of regard.

Appellants have demonstrated that there occurred during the limitations period vacancies for which they were qualified and for which they would have applied if not for their justified belief, based on Hudson's discriminatory practices, that to do so would be futile. I conclude that the district court committed legal and factual errors in analyzing appellants' transfer claim and in holding that plaintiffs had not established a prima facie case. Those errors should require us to remand this case for fact-finding on the issues whether Hudson's past and present discriminatory practices led appellants to believe they would not be allowed to transfer and, if so, whether this belief in the futility of application actually explains appellants' failure to apply. Furthermore, as the record clearly shows that appellants established a prima facie case of continuing sex discrimination in promotions, I would reverse the district court's dismissal of that claim and remand for completion of trial. The majority determines otherwise and so I respectfully dissent.