Albert NAPIER, Plaintiff,

v.

WEYERHAUSER, INC., Defendant.

Civ. A. No. 89–215–2–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

May 2, 1991.

M. Linda Mabry, Macon, Ga., for plaintiff.

Adam J. Conti, Atlanta, Ga., for defendant.

## ORDER

OWENS, Chief Judge.

Mr. Albert Napier ("plaintiff") filed the present action on June 28, 1989, against his employer, Weyerhauser, Inc. ("Weyerhauser"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). A non-jury trial was held in this court on January 28–29, 1991. The court, having considered the arguments of counsel and the record as a whole, hereby makes the following findings of fact and conclusions of law.

## FACTS

Weyerhauser opened a plant in Macon, Georgia ("the plant") in 1979. The plant produces several types of disposable baby diapers and has in the past produced similar products such as adult incontinent products and sanitary napkins. The process of production essentially involves the utilization of a wood pulp product which is incorporated into sealed products and packaged for shipment.

Mr. Tom Scott ("Scott") is the plant manager. During a tour of the facility and at trial he explained that the lines workers are principally responsible for overseeing the operation of the machines and/or placing the finished diaper products into packages for shipment. The actual production of the diapers from raw material to finished, folded product is fully mechanized. In addition to employees who work directly on the production line—line workers, operators, and assistant operators—the plant also employs utility workers, reclamation

workers, and supervisory staff. The positions of operator and assistant operator as operating line level positions are among the higher, more lucrative, and more demanding positions on the production floor.[1]

Each operator is responsible during his/her eight-hour shift for keeping the production of his/her line at a level commensurate with standards set by Weyerhauser's national office in Seattle, Washington ("the corporate office"). These standards are accounting standards dictated to the plant from the corporate office ("production standards"). The corporate office changes the production standards from time to time based upon evaluation of the complexity of the product and the length of the production line required to produce a finished product and the production levels required to maintain profit margins suitable to the corporate office. Weyerhauser's production supervisor at the plant, Mr. Barry Justice ("Justice"), testified that these standards are not subject to variation by management at the plant based on technological changes and problems or day-to-day production system variations at the plant; the standards are periodically changed only by directive from the corporate office based upon its profit margin analysis.

The three production standards to determine performance on a particular product are "Production, Downtime, and Waste." An employee's performance as it compares to the production standards is calculated over the employee's eight-hour shift; su-

pervisors are periodically given printouts of each employee's production performance figures—weekly, monthly, quarterly, etc. Each type of product has separate production standards, *i.e.*, sanitary napkins were subject to different standards from those set for disposable diapers. If a machine begins running a different product, the production standard changes as well.

The standards are developed and evaluated as follows:

1. Production is determined by taking the number of diapers actually produced during an employees eight-hour shift and dividing that number by the number of diapers in a "standard case" or 180 diapers.[2] The quotient reflects the number of standard cases produced per hour.

2. Downtime takes the number of minutes during which a particular machine is actually operating and producing the product and divides that number by the 480 minutes of available time in an eight-hour shift. The quotient reflects the percentage of time when a machine was not operating—Downtime.[3]

3. Waste is calculated by subtracting the number of marketable diapers actually produced from the number of diapers which the corporate office determined should be produced during an eight-hour shift. The difference is Waste.[4]

Line operators are informed periodically with regard to their performance as it compares to the production standards set for their line. While ability to meet production standards is an important factor in evaluat-

---

**1.** Sometime after the events relevant to the dispute before the court, Weyerhauser restructured its management system to what is called a team concept. The structure of the team system is relevant only in that from time to time witnesses used terms from the team system to describe operations in effect before the team system was implemented.

**2.** Justice explained that a "standard case" does not reflect the number of diapers in an actual "customer case" of product. The number of diapers in an actual case varies. The "standard case" figure was developed by the corporate office to allow continuity in the evaluation of plant production.

**3.** Justice testified that Downtime includes breaks and the time when a machine was being repaired. Downtime also includes any time

during which an employee stopped the machine for scheduled breaks. Justice testified that during operators' breaks, an assistant operator would run the machine. (The court addresses *infra* its concerns about the fairness of this evaluation due to the uncontroverted testimony that plaintiff operated his line without an assistant). When a machine is being serviced for a long period of time, employees are, when possible, shifted to other machines to avoid inordinately high levels of downtime from being charged against the employee.

**4.** Justice testified that production of finished product in an unsalable condition would be calculated as waste as well.

ing employees, Justice testified that there is no set formula directing a supervisor's decisions with regard to whether an employee is performing adequately. This determination is subject to a number of other subjective factors as well. He testified:

> Production standards are just one of the variables that's (sic) used in determining where to—how to handle a crew leader [operator].... Generally speaking, a crew leader [operator] is never written up just for these figures.... There's other factors that come in factor (sic) with it. You don't just write 'em up based on these figures; this is not the whole thing. There's just too many variables just to take [production standards] and write some one up with [them].

Non–Jury Trial, January 28–29, 1991.

Justice explained that while the corporate production standards were reevaluated and changed only approximately once a year, the standards did not allow for the constant changes in technology and consumer demand. These other factors, as well as mechanical problems, an operator's ability to identify the source of the problems quickly, and problems with personnel were not used in developing the production standards. A supervisor, in order to be fair, had to take such additional factors into consideration when evaluating an employee. Justice continued:

> If it was a constant, never-changing operation, then you could say "okay, if you don't make your Downtime 80% of the time, and your Waste 80%, and your cases 80% of the time, then we're gonna write you up." But because we're changing so much, there is a lot of subjectivity in being a supervisor as to what's reasonable.

*Id.*

Justice testified that the only really structured system guiding the criteria used in imposing disciplinary action were the progressive levels of the types of disciplinary action to be implemented. He stated:

> The general rule is the employee [is given] an oral warning, then a written warning, then a suspension, then termination. However, for certain types of violations you may very well skip. In fact, for certain violations you would terminate the employee on first offense.

*Id.* Justice admitted that a supervisor's evaluation of a particular employee's work was an essentially subjective process based upon several varying factors.

Plaintiff was one of Weyerhauser's first employees; he was hired as an assistant operator in March of 1979. Justice testified that plaintiff was a loyal and responsible employee. Plaintiff became an operator in 1980; in this capacity he rotated between lines 1 and 2. Despite plaintiff's efforts, plant supervisors were not pleased with plaintiff's inadequate performance on these lines. On November 10, 1980, Justice held a meeting with plaintiff during which Justice pointed out *inter alia* that plaintiff's performance was less productive than that of operators with less experience and that plaintiff was unable to demonstrate a mastery of the machinery. Defendant's Exhibit 7. Justice indicated that plaintiff would be re-evaluated around the end of the year to determine whether he should remain in the position of operator. The record is silent as to whether such a reevaluation was ever conducted.

In 1981, Weyerhauser opened a new line ("line 5") for the production of a disposable insert which was marketed as additional absorbency protection for overnight use: the diaper doubler. Defendant's Exhibits 4, 58. Line 5 was also mechanized to produce a similar product designed for adult incontinent products; these were produced on a much more limited basis. Defendant's Exhibit 5.

The testimony at trial, as well as this court's observation of production at the plant, demonstrate that line 5 was one of the shortest lines in operation at the plant.[5] This line was also among the least demanding and least complicated to operate. Most

---

**5.** Sometime after the court toured the plant, line 5 was dismantled. Consumers appear to prefer to use diapers developed specifically for over-

night use; there is simply no market for diaper doublers.

of the other lines at the plant produced some variation of a full disposable diaper. See Defendant's Exhibit 7. Diaper absorbency is dependent upon the same pulp fluff found in the diaper doubler, but production involves such additional features as polyester covers, elastic leg and waist bands, and adhesive tapes. Each additional feature requires an additional step in production and presents additional technological production problems.

Scott and Justice, still concerned with regard to plaintiff's inability to master production machinery on lines 1 and 2, determined that plaintiff should be assigned as operator of the simpler line 5. Plaintiff was transferred to this new line in 1981 as an operator, and remained in that position until he was demoted to the position of utility worker in October of 1985. For the entire period that plaintiff worked on line 5, Justice provided individual assistance and supervision to plaintiff; this individual attention included times when Justice made himself available outside of working hours to provide special training to plaintiff in the operation of the line 5 stacker mechanism.

In April of 1982, Justice conducted what was apparently an annual performance evaluation of plaintiff's work. Defendant's Exhibit 8. While plaintiff scored characteristically high marks with regard to his reliability and loyalty, Justice identified plaintiff's continued inability to understand the mechanical processes on his machine. The comments attached to the evaluation also identify plaintiff's problems with communication skills as well as problems with productivity. Plaintiff apparently improved his performance over the years 1983–84. See Plaintiff's Exhibit 28: Employee Evaluations 1983, 1984.

On May 22, 1985, however, Justice again met with plaintiff to discuss plaintiff's problems with regard to production and plaintiff's inability to master the mechanical processes of his machine. Defendant's Exhibit 9. Plaintiff was told that his performance would have to improve if he wished to remain on line 5 as an operator. On September 23, 1985, Justice held another meeting with plaintiff to discuss plaintiff's continuing inability to consistently meet production standards as well as problems with plaintiff's inability to troubleshoot without requiring supervisors to spend inordinate amounts of time helping plaintiff with the operation of his comparatively simple line. See Defendant's Exhibit 10; Non Jury Trial, January 28–29, 1991. Plaintiff was again warned that he would have to increase his output and understanding of the machine processes.

On September 26, 1985, Justice held an additional meeting with plaintiff. Plaintiff was again informed of the need for plaintiff to meet recently raised production standards; these standards had been raised, as always, by corporate headquarters. Plaintiff's problems with mechanical troubleshooting and with communication skills were also identified as areas requiring improvement.[6] Justice also identified poor housekeeping and disorganization as deficiencies in plaintiff's performance. Defendant's Exhibit 11.[7]

When plaintiff was confronted with the possibility of being taken off the line he was also informed and aware of the option of choosing to be voluntarily taken off the line. Had he exercised this option, it is undisputed that he would have been able to bid back onto the machine as an assistant operator. In turn, plaintiff could eventually bid back into the operator position; bidding into these positions was, at the time, a matter of seniority and rotation. See Defense Affidavit (filed 02/08/91). Plaintiff, instead, opted to stay on line 5 and run the risk of a demotion without the option to

---

**6.** Plaintiff argues that the identification of communication problems amounts to a veiled racial slur. However, plaintiff's own witness, Mr. Johnny Hudson, a black man and former operator at Weyerhauser, when asked if it were not true that he, too, had been told that he needed to learn to talk right, testified that he had never been criticized for his inability to communicate clearly.

**7.** Justice indicated on the form and in his testimony at trial that his concerns with regard to plaintiff's housekeeping problems did not include problems with pulp dust. Defendant does not dispute that until the installation of a "dust tent," dust created an ongoing problem with housekeeping on line 5; this problem did not, however, affect productivity on line 5.

quickly bid into the assistant operator position.[8]

During the period from May 19, 1985, until his demotion on October 30, 1985, plaintiff, according to his documentation, met his Production standard twelve (12) out of 21 weeks, met the Downtime standard three (3) out of 21 weeks, and met his waste standard eleven (11) out of 21 weeks.[9] On October 30, 1985, plaintiff was taken off line 5. In a memorandum to Jerry Boyd, then plant superintendent, Justice identified four general areas which had led him to pull plaintiff from line 5. These were:

(i) plaintiff's inability to meet production standards;

(ii) plaintiff's inability to comprehend and master mechanical processes on line 5;

(iii) plaintiff's inordinately high need for supervisory help with a line which he had worked on for over four years; and,

(iv) plaintiff's lack of self-reliance in addressing problems with line 5.

*See* Defendant's Exhibit 14.

Plaintiff does not contest the production figures put forward by Weyerhauser with regard to his work. Rather, plaintiff produces numerous documents which demonstrate that white operators on other lines often or periodically failed to meet one or more of the production standards.[10] Justice admitted that several of these employees had periodically failed to meet production standards. Justice also conceded that many of these employees went without reprimand for these failures. However, Justice emphasized that he was not surprised that these operators had gone without disciplinary action.[11] He reiterated that production standards alone are not the sole basis of evaluation of an employee's performance—nor were they the sole basis of his critical evaluation of plaintiff.

Justice testified that comparisons of raw data with regard to production standards from different production lines are meaningless.[12] He defended this statement by pointing out that no employee had ever been written up simply for failure to meet production standards. In many instances, an operator's inability to meet production standards was attributable to changes in the production procedures on a particular

---

**8.** The court notes Plaintiff's Exhibit 59, dated 11–25–85, which recounts Justice's conversation with a white operator, Steve Merritt, whose production was for a period unacceptable. The memo emphasizes that Merritt's decision to voluntarily bid into the position of stacker had avoided the financial and bidding problems associated with demotion to utility. Because he recognized his low production problems, Mr. Merritt bid into the stacker position and was eligible to bid back onto the machine in six months.

**9.** No data was presented at trial for the weeks of 08/18/85, 08/25/85, or 10/20/85. Some of this time represents periods when line 5 was used to produce a slightly more complicated adult incontinent pad. Plaintiff's performance in producing this product was substandard as well. *See* Defendant's Exhibit 12.

**10.** Plaintiff also alleged that many of his problems with regard to production were attributable to what he considered insurmountable production problems with his machine. *See* Plaintiff's Exhibits 35, 36: Notes from line 5 crew meeting; Non Jury Trial Testimony of Barry Justice (plaintiff, in meetings held in September and early October of 1985, identified several problems which allegedly impeded production).

**11.** Defendants also point to instances in which operators, black and white, who were not meeting standards were subject to disciplinary action, demoted, or voluntarily opted off a machine. *See* Defendant's Exhibits 29, 37, 51. The court considers this evidence only to the extent that it reflects employment actions taken up to the time of plaintiff's demotion.

**12.** It is worthy of note that plaintiff's documentation indicates that after plaintiff was replaced, Production on line 5 ran in excess of the higher 110 standard case per hour goal (plaintiff's standard was, for most of his time as operator, only 90 standard cases per hour) on 19 of the next 22 weeks for which data is available; Downtime was within the standard on 17 of the 21 weeks for which data was available; and, Waste was within the standard on 21 of 22 weeks. Plaintiff's Exhibit 6. Justice testified that many of these standards were met despite the fact that some of the "necessary" changes identified by plaintiff had yet to be implemented. *See*, note 10, *supra;* Defendant's Exhibits 24–28 (despite continuing problems identified at team meetings held after plaintiff's demotion, new operator met and exceeded standards; new operator also demonstrated ability to identify and address problems with line efficiency).

line or was traceable to problems other than the operator's performance. He concluded that he could never, simply by looking at raw production standard figures, state whether a particular employee would be written up—there are too many other factors which he would first have to consider. Comparisons of production data from different lines which implemented differing levels of technology and machinery reveal nothing about the situations under which the separate crews and operators were working.

Without exception, Weyerhauser's supervisory employees testified, as borne out by evaluations in the record, that they considered plaintiff a valued employee at Weyerhauser. They simply concluded that plaintiff lacked the skills to consistently meet the requirements, including but not limited to production standards, to continue in the position of operator. They each identified plaintiff's problems with communication skills as well as his problems with understanding mechanical processes as areas affecting his performance as an operator.

Plaintiff also alleged that Justice was less responsive to his requests than to those of other line operators. The only evidence offered by plaintiff to support this claim, aside from plaintiff's testimony, was the testimony of Johnny Hudson. Hudson testified that he, too, suspected that Justice was less responsive to his requests than those made by white operators. There is no indication in the record of any complaint, by plaintiff or Hudson, ever being made concerning Justice's responsiveness. Finally, the court again notes Hudson's testimony that he was never criticized by Justice concerning his inability to "talk right." The court finds unpersuasive plaintiff's proffered evidence attempting to show a lack of responsiveness on Justice's part to the requests of black operators. As a factual matter, the court finds that plaintiff has not shown that he was subjected to racially-motivated, derogatory comments from any plant supervisor.

## DISCUSSION

■ The court is satisfied that plaintiff has produced no direct evidence of discrimination. In the absence of such direct evidence, plaintiff's case must be analyzed under *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It is clear that plaintiff is a member of a protected class and was taken out of a position and replaced by someone not in the protected class. Weyerhauser questions whether plaintiff was any longer qualified to meet the requirements of the position. However, in situations such as the case *sub judice* where a plaintiff was discharged from a previously held position, the *McDonnell Douglas* test, as modified, does not require proof of qualification. *See Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495, n. 2 (11th Cir.1987) ("any disagreement between the parties regarding whether a particular plaintiff was adequately performing his job would be brought out at the stage of the proceedings when the defendant articulates legitimate reasons for the discharge and the plaintiff shoulders his burden of proving that the reasons are pretextual").

■ While the *McDonnell Douglas prima facie* case was formulated in the context of discriminatory hiring, the purpose underlying the analysis retains equal vitality where discriminatory discipline is alleged. *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir.1989). Plaintiff seeks to establish his *prima facie* case under *McDonnell Douglas* based upon allegations that similarly situated white employees were treated differently—less harshly—for the same conduct. *Id.* The case before this court does not, however, fit neatly into the context of a discriminatory discipline case. Neither plaintiff nor Weyerhauser argues that plaintiff affirmatively violated a traditional work rule such as drinking on the job, theft of company property, etc. The case before this court fits properly into the analysis under *Rosenfield*.

Should Weyerhauser articulate a legitimate, non-discriminatory reason for the demotion, the burden, under *McDonnell Douglas*, returns to the plaintiff to prove

by significantly probative evidence that the proffered reasons are a pretext for discrimination. *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). The court first will consider plaintiff's argument alleging that the reasons put forward by Weyerhauser for plaintiff's demotion are not legitimate, non-discriminatory reasons and are also pretextual.

■ Plaintiff argues that disciplinary action of an employee violates Title VII if the same action would not have occurred had the employee been of a different race. *McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Weyerhauser has articulated numerous undisputed and allegedly non-discriminatory reasons for Justice's criticisms of plaintiff's work and plaintiff's eventual demotion. Plaintiff admits to numerous cited instances of his own insufficient performance of his job duties; he takes issue only with the severity of the action taken against him in light of other white employees who allegedly suffered no disciplinary action for similar deficiencies.

In making his claim, plaintiff relies on a comparison of compilations of other white employees' performances under Weyerhauser's production standards. Weyerhauser does not actually dispute the fact that these white employees experienced problems meeting these accounting standards for their product. Rather, Weyerhauser argues that these employees were assigned to product lines which were more complicated than line 5. The operators on these other, more-complicated lines were not, like plaintiff, hindered by communication problems, by problems with understanding the mechanical processes of their line, or by an inability to troubleshoot.[13]

Weyerhauser argues that supervisors' evaluations of employees, in order to be fair, had to account for variations in machine complexity and production length when analyzing production figures. According to Weyerhauser's records, no supervisor at the plant ever evaluated a line employee solely on the basis of the raw, objective criteria cited by plaintiff in support of his argument that the reasons articulated for his demotion belie racial discrimination by Weyerhauser. Plaintiff failed to master satisfactorily the necessary skills to meet the changing job requirements. Weyerhauser argues that this deficiency, along with concerns about plaintiff's overall lack of aptitude, led to a demotion because, unlike other line operators, plaintiff worked for a prolonged period on a less complicated line with simpler products than the standard diapers being run on other lines.

■ Plaintiff responds that the use of such a subjective evaluation system has been condemned as ready conduit to raced-based decisions. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law: Tab 34, pp. 13–14; *Stallworth v. Schuler*, 777 F.2d 1431, 1434 (11th Cir.1985) (citing *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985)). In *Stallworth*, the Eleventh Circuit specifically condemned the use of an informal, purely subjective system of appointment as a discriminatory tool. *Id.* Indeed, these cases have held that subjective practices such as interviews and supervisory recommendations *are capable* of operating as tools for race discrimination. *Griffin*, 755 F.2d at 1525.

Plaintiff, however, insists that in all cases "subjective criteria in the enforcement of policies or rules *is not* a legitimate non-discrimination (sic) reason." Plaintiff's Proposed Findings of Fact and Conclusions of Law: Tab 34, p. 14 (citing *Williams v. City of Montgomery*, 742 F.2d 586 (11th Cir.1984), *cert. denied*, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985)). In *Williams*, the Eleventh Circuit held that the articulation of a *purely* subjective justification for retaining two white employees but firing the black plaintiff, when all three had violated a *written* policy mandating

---

**13.** By way of example, defendant points out that line 2—which produced full baby diapers—was at least three times as long and much more complex than line 5. Plaintiff does not rely on or present evidence which would suggest that other operators, hampered by similar, production-related problems did not suffer demotion.

the discharge of any employee convicted of a felony, was insufficient to establish a "legitimate non-discriminatory reason" for plaintiff's termination. *Id.* at 588, n. 2.

However, case law from this circuit demonstrates that *Williams* was not meant as an absolute prohibition against the use of subjective criteria in evaluating employee performance; a close reading of the case also confirms Weyerhauser's argument that *Williams* is factually distinguishable from the case *sub judice.*

The nature of Weyerhauser's procedures and of the reasons offered for the adverse employment decision affects the weight of its burden; "[w]here the reasons that the employer offers for [the adverse employment decision] are based on *purely subjective factors,* the defendant's burden is greater." *Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1010–11 (11th Cir.1984) (emphasis added). The more subjective the job requirement and the more subjective the manner in which it is evaluated, the more difficult the task of a defendant who relies upon subjective criteria to legitimize its actions with regard to a particular employee. *Thompkins v. Morris Brown College,* 752 F.2d 558, 564, n. 16 (11th Cir.1985); *see, also, Harris v. Birmingham Board of Education,* 712 F.2d 1377, 1383–84 (11th Cir. 1983) (erroneous belief that plaintiff did not want the job denied him held insufficient to meet defendant's burden). Nothing in the law, however, *forbids* the use of subjective criteria in the evaluation of an employee's performance.

In *Williams,* the Eleventh Circuit held that the defendant's offered justification for firing the black fireman was insufficient to establish a legitimate non-discriminatory reason because the rule in question

required termination for its violation. *Williams,* 742 F.2d at 588. Unlike the employer in *Williams,* Weyerhauser's procedures did not require disciplinary action for failure to meet the three accounting standards. The case *sub judice* does not involve inconsistent application of an established, objective rule by an employer. Justice candidly admitted that failure to meet the standards on a continuing basis, when—at the request of counsel for plaintiff—evaluated in isolation, would indicate a potential problem that might merit investigation and perhaps supervisory, disciplinary action. However, he continued, Weyerhauser never disciplined an employee solely based upon these standards.

■ Weyerhauser has never argued that plaintiff was demoted solely because of his inability to meet production standards. While this deficiency was clearly instrumental in his eventual demotion, plaintiff's emphasis and comparison of these figures is simply misplaced and overstated.[14] *See Sims v. Montgomery County Commission,* 544 F.Supp. 420, 426 (M.D.Ala.1982) ("uneven application of criteria is strong evidence that the criteria were never in fact employed in the selection process").

In *Sims,* the *employer,* not the plaintiff, sought to put forward certain criteria as justification for its hiring decisions; the court held that the evidence demonstrated that the employer had not in fact relied upon the referenced criteria. Certainly, if Weyerhauser had demoted plaintiff based solely upon his inability to meet production standards, plaintiff's evidence might point to inconsistent treatment.[15] However, the documentary evidence and testimony in the case *sub judice* demonstrates that no em-

**14.** The court does not mean to suggest that an "uneven" application of any alleged rules governing the production standards has been shown. Plaintiff's comparisons of the data with regard to the production standards serves to demonstrate only that they were not used as a sole determinant as to whether an employee would suffer disciplinary action.

**15.** Weyerhauser briefly argues that plaintiff might have been subject to a non-discriminatory demotion justified solely on the basis of his inability to meet production standards. Weyer-

hauser argues that the comparison of this data from line to line and product to product is impossible given that plaintiff worked for a prolonged period of time on a line much simpler than the others at the plant, yet still failed to meet production standards. The evidence indicates that Justice's decision was not based solely upon these figures. The court is not required to pass upon whether plaintiff's demotion could have been fairly based on this deficiency alone; the court's decision is not based on such an improper analysis.

ployee was ever disciplined based solely upon the factors put forward by plaintiff. The court must, therefore, determine if the subjective criteria relied upon by Weyerhauser in evaluating the performance of plaintiff and all other operators amount to legitimate non-discriminatory reasons for plaintiff's demotion.

Given that subjective criteria have been identified as a "ready mechanism" for racial discrimination, this court, like the court in *Sims*, must receive and consider these subjective criteria with great caution. *See Id.* (citing *Parson v. Kaiser Aluminum & Chemical Company*, 575 F.2d 1374, 1385 (5th Cir.1978), *cert. denied sub nom., Local 13000, United Steel Workers of America, AFL CIO CLC v. Parson*, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979)). However, the court's careful examination of these criteria does not extend so far as to allow this court to impose upon Weyerhauser the court's judgment of what factors should or should not be considered in evaluating its employees. *See* note 15, *supra*. The court cannot declare unlawful every unfair employment decision. *See Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905 (11th Cir.1990) (citing *Holder v. City of Raleigh*, 867 F.2d 823, 825–26 (4th Cir.1989) ("The list of impermissible considerations within the context of employment practice is both limited and specific.... We are not free to add our own considerations to the list...."); *see, also, Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) ("While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination"). The court, for instance, might find fault with Weyerhauser's calculation of Downtime to include every minute of a working day, including breaks, meals, etc. However, so long as these standards do not operate in a manner which is discriminatory, the court does not sit to second guess the wisdom of Weyerhauser's methods.

Justice testified that the necessity of using a subjective employee evaluation system was traceable to the tremendous variations in line complexity and operator familiarity with his or her machines. In fact, Justice's testimony suggested that to implement an evaluation system based solely upon the objective data set out under the production standards would itself be unfair.[16] The documentary evidence supports Justice's testimony to the effect that plaintiff was the operator of a relatively simple line; that plaintiff required individual instruction and supervision to an extent unacceptable to Weyerhauser for an operator with many years experience; and, that plaintiff experienced recurring problems with communication skills and mechanical aptitude.

In 1985, after numerous discussions and meetings with plaintiff and following a one-month probationary period, during which plaintiff's productivity and ability to identify problem areas of production did not rise to levels satisfactory to his supervisors, and after plaintiff chose not to take advantage of his right to be voluntarily rotated off the machine until some later opportunity to bid back on presented itself, Weyerhauser demoted plaintiff to utility worker. This demotion was the result of Justice's admittedly subjective, though legitimate, non-discriminatory, business-based, evaluation of plaintiff's ability to meet the ever-changing requirements of the operator position.

Justice based his ultimately subjective decision upon an evaluation of the objective data in light of plaintiff's situation, experience, and overall proficiency. These reasons, while subjective, are not so incapable of objective evaluation as to render them

---

**16.** This would certainly be true with regard to Downtime. The uncontroverted testimony was that only line 5 operated without an assistant. To judge this operator by the same Downtime standards might unfairly weigh time for breaks, which other operators could take while leaving the machine to their assistant operator thereby avoiding the need to shut down their machine, against him. Similarly, Justice explained, to judge an operator of a more complex machine which was subject to constant technological variation by the same raw data as an operator of the simpler line would be equally unfair.

inadequate to meet the defendant's burden. *Accord Fowler*, 737 F.2d at 1011 (subjective decision of supervisor not to hire applicant held sufficient to meet defendant's burden where supervisor relied upon objective data to reach decision). Weyerhauser presented a reasonable explanation for the need to implement this subjective evaluation process in a constantly changing setting in which several products requiring differing technologies are produced.

Plaintiff relies upon the same or similar evidence to argue that, if legitimate, the concerns which Weyerhauser alleges led to plaintiff's demotion are a mere pretext for discrimination. No evidence has been produced by plaintiff to expose pretext in the reasons offered by Weyerhauser for plaintiff's demotion. The record indicates that all employees were subject to evaluation under this subjective system. The evidence reveals nothing discriminatory in Weyerhauser's application of the subjective system of evaluation to plaintiff. Plaintiff has failed to demonstrate by significantly probative evidence that the proffered reasons are a pretext for discrimination. *Young*, 840 F.2d at 829.

The court hereby finds that Weyerhauser has articulated legitimate non-discriminatory reasons for plaintiff's demotion. Plaintiff has failed to carry his burden to prove pretextual these articulated reasons.

Accordingly, let judgment be entered in favor of defendant and against plaintiff.

SO ORDERED.